The United States Court of Appeals for the Ninth Circuit is now in session. Good afternoon and welcome to the Nakamura Courthouse here in Seattle. It's a pleasure to be here. This is the time set for the case of Arizona Alliance for Retired Americans v. Kristin Mayes, Yuma County Republican Committee, and Katie Hobbs, and the United States of America. The parties are ready to begin. Come forward. I understand that there's some shared time. Is that correct, Mr. Sims? That is, Your Honor. So the plan is that I will take 20 minutes of appellant's time attempting to focus my arguments on the standing arguments. The United States will go next, also talking about standing for 10 minutes, and then the committee will argue for 10 minutes, planning to focus on the merits of the cancellation provision and the felony provision. Okay. If you're ready to proceed, thank you. Excuse me, Your Honors. Good afternoon, and may it please the Court. My name is Alexander Samuels. I'm here on behalf of Arizona Attorney General Chris Mayes. Like I said, I intend to focus my arguments on the standing as it relates to both provisions, and I'll start with the cancellation provision, although I hope I'll get the opportunity to talk about the felony provision as well. And in our view, in light of the clarification offered by Hippocratic Medicine by the Supreme Court last year, it is simply the case here that plaintiffs cannot make the clear showing of standing that is required at this early preliminary injunction stage of the litigation. We think this Court's post… I have a question for you. If we were to hold that an organization has suffered an injury, in fact, when the defendant's conduct directly interferes with their core activities, requiring the organization to divert resources in response, setting aside perhaps a couple of outliers in our circuit, how is that any different than the organizational standing test that's set forth in Hippocratic Medicine? Well, I think one key difference is I think that's not quite the test that this Court has typically applied. The second part, the diversion of resources, I think that's accurate. The first part has typically been characterized as frustration of mission, which we think is quite different than interference with core activities, which is the focus of the Supreme Court's decision in Hippocratic Medicine. So if I were to use those terms interchangeably, the frustration of mission or an infringement or an impact on the core activities, then you'd agree that that is essentially the test that's been set forth in Hippocratic Medicine? Well, I think I would push back pretty strongly on the idea that those two should be used interchangeably, but I take your question to be asking if you did view them interchangeably, would things remain the same? I still think the diversion of resources aspect of this was disapproved of as well in Hippocratic Medicine, and the Court spoke to that quite specifically. And I think it may be helpful for me to lay out at the beginning why exactly we think Hippocratic Medicine changed things or at least is inconsistent with this Court's case law. So you're saying Hippocratic Medicine categorically says something that forces a diversion of resources can't be injury? Not categorically, but I think in the broad way in which it's applied and has been applied in some cases in this circuit, I think it doesn't work anymore. Those are you referring to when you say that the circuit has sort of categorically allowed diversion of resources by itself? So I think there have been several cases in which the diversion has been largely voluntary, and that's really the problem. So I think Sabra is a good example, and it's one of the cases that the panel opinion talks about, where the actions that were really at issue there were not directly affecting the organization there in the same way that the Havens Realty actions were affecting HOME, the organization in that case. And instead, the diversion of resources was much more voluntary on the organization's part, and that I think is probably or almost certainly inconsistent with how Hippocratic Medicine views the diversion of resources piece. And they spoke to it very specifically. As to diversion of resources, Hippocratic Medicine said it was incorrect, that's the word they used, to say that standing exists when an organization diverts its resources in response to a defendant's actions. And that's a quote. So the way I see it, the plaintiffs, to establish standing here, they need to show that the new statute, the cancellation provision, so I'll just use that term, I think that's the term you use, arguably requires the county recorder to cancel a person's last-in-time registration, which would then directly impair their core activity of registering voters, because perhaps somebody that they registered to votes knew registration would be canceled. Do you agree with that? I think I would take issue at a couple places. One is I don't necessarily read plaintiffs to be saying that this statute will necessarily require cancellation of registrations. I read them to say that the statute at least leaves open that possibility, which I think then gets you to a more complicated causation analysis. The other point that I think is important is use the word arguably. And I think arguably is not necessarily the standard as it relates to how this court looks at a statute in the context of the cancellation provision. The court has used the word arguable in terms of looking at statutory interpretation at the standing phase of the inquiry. But those cases in which the word arguable has been used are like the felony provision here, where it's a pre-enforcement challenge against a statute where the plaintiff is potentially facing consequences for their actions. And there's good reason to apply a more liberal standard there, and the court has said many times that it does apply a more liberal standard in those cases, because activities might be chilled and cases may never get to the court because people may not want to face criminal prosecution. Counsel, you had talked in footnote three to your response to the PFREB. You referred to the panel opinion and their use of the term already existing core activities. And you described it in your footnote as this temporal qualifier is dictum. And I mean, we're obviously as an embanked panel looking at this anew. If we thought that under Hippocratic medicine we needed to look at core activities, what is Arizona's position as to whether they need to be already existing core activities or it could involve, for example, as you put in the footnote, core activities that the organization was imminently planning to engage? Yeah, I think our point there is that the panel opinion in our view, if read literally there, it probably applies a little bit too narrow of a test. In that an organization might have completely imminent, you know, the next day they are planning to launch a brand new program. They've been planning it for a year. And then something happens from a defendant that interferes with that plan. I think that's probably enough. I think the point that the panel was probably trying to make is that what you can't have is an organization that decides to undertake new activities in response and that that's where you really run into a problem. Mr. Samuels, about the in response piece, what part of that is in Hippocratic medicine's gloss on Haven's realty? Where does that come from? Well, Hippocratic medicine at 395 does say that it's incorrect to say that standing exists when an organization diverts its resources in response to a defendant's actions. Right, but alone, right? What it's saying, and I think this was your opening point, is that that's kind of the wrong question. The diversion of resources is a diversion. The question is whether the defendant's activity interferes with the plaintiff's core business, right? Yes. And that would be the sum of the response, whether it interferes with the defendant's, the plaintiff's core business, right? Whether that's in the response to or not, whether it's new, for example, to get to your point about the footnote in Judge Bennett's question, doesn't matter, right? As long as the defendant's activities are interfering with the plaintiff's core business, whatever it's in T1 or T-1, whatever difference it's making, that's not the inquiry. The inquiry is whether it's an interference, right? I think that's right. How would you define core business? If that's what you're saying, the Supreme Court seems to suggest to look at an organization's core business activities. So in response to Judge Johnstone, how would you define that? It seems that we would have to define that. Yeah, I think it's a difficult thing to define beyond the term itself. But I think it will often be pretty obvious. You look at cases from this court. Well, that's a Pollyanna thought. Well, my point is simply, if you look at the cases that have come from this court, we think it's typically pretty clear what the core business activities are. And you look here, we have not disputed that voter registration activities are a core business activity in this case. And I don't think the court really needs to devise a test for that or more explicitly define it, because I don't think that's really been where the crux of the issue is in prior cases if we were to apply Hippocratic medicine there. And, Judge Johnstone, to follow up on your point, I really think the diversion of resources piece, I think part of the problem here in the Supreme Court's view, as I read Hippocratic medicine, is that too much weight has been put on diversion of resources. You know, you asked earlier, is diversion of resources irrelevant now? And I don't think that's right. I do think diversion of resources may be part of the calculus. But, you know, as the Sixth Circuit recently observed, its case law had similarly to this court really focused on diversion of resources, really made it a core part of their test, and that doesn't work anymore. And I think that's exactly the problem here. Counsel, I want to turn you back to what I think you were going to say about arguable interpretation of the statute and how you think that's appropriate in a pre-enforcement challenge, presumably to some kind of criminal prohibition like the felony provision. But I don't think you got to explain to me why you think that shouldn't be the standard here. What's the difference about the cancellation provision? Yeah, thank you very much for the question. I appreciate the opportunity to expand on that. I think the difference is, number one, that arguable standard comes exclusively from that one context. It does not appear, it appears in the dissent here as a broader proposition, but I don't think that there's broader support for the fact that arguable is the standard across the board. I think it's really important to distinguish between statutory interpretation and the merits. The merits as to the cancellation provision is, is there a preemption problem here? That is the merits. But the statutory interpretation, while it's obviously going to inform the merits, is not the merits itself, and it also needs to inform the standing inquiry. So to use sort of a far-fetched hypothetical, imagine you had a new statute that regulates bats, and that's all it says. And the next day you get two lawsuits filed, one by a sporting goods store that says, this regulates our sale of baseball bats, and the other from a, say, exotic pet store that says, this regulates our sale of animal bats. One of those two parties is not injured because the statute applies to one or the other, and the court needs to look at the statute to figure out whether there is injury. Well, I'm not sure I get that analogy because you're talking about if one of them said, I'm afraid that this statute is going to be enforced against me, we would be in the pre-enforcement challenge box. So what is different about the cancellation provision? What box is, if it's not a pre-enforcement challenge, it's some other type of regulation that won't be enforced against any private party? Is that the distinction you're making? Is it, you know, that there's really no threat of a, no violation, I guess, by a private party that's going to happen that they could be afraid of? Is that the distinction you're drawing? I think the point's a little different. I take the point that that hypothetical could be sort of drawn into the pre-enforcement context. We could add details, but set that aside. The core point is that in the hypothetical, the court needs to look at the statute and interpret it in order to determine whether there is any injury, which is the number one thing you're asking at the standing inquiry. In the pre-enforcement context, we don't. We very much say that we're not going to actually decide whether, you know, whose interpretation is correct, and we've talked about the bizarre situation in which essentially the party's, you know, interpretation of the statute is reversed in their standing arguments as it would be on the merits or in their own self-interest. But what I thought you were saying is this isn't a pre-enforcement challenge, and that's why we, but I'm trying to understand, if you can put a finer point on it, why is the challenge to the cancellation provision not a pre-enforcement challenge? Why doesn't it fit into that box? Well, because in a pre-enforcement challenge like you have with the felony provision here, it's a direct regulation of the organization and its members in this case, and I think that's the fear is that, you know, they're facing prosecution under a criminal provision, and pre-enforcement cases in the context we're talking about, and I think that word sometimes gets used more broadly, but in this specific context, that's what you're talking about. It's a direct regulation of the plaintiff. That's not the cancellation provision here. So I'm trying to understand, you know, I get your point that arguably requires or arguably allows the county recorder to cancel is not the test, but I think what you're really getting at is that the injury that the plaintiffs are alleging is too speculative. The bottom line is that we need to look to see whether it is likely or possible, and so I guess I want you to sort of tell me what is your best argument for why the allegation that this could happen and then result in an impact on their core activities is too speculative. Sure. I think there are other problems that they have and that I think a lot of their, like if you look at the declarations below, a lot of it is directed at diversion of resources and frustration of mission, but to answer your question. Like you said, you're not arguing, and I just want to make sure that I understand this, to Judge Johnstone's point, you are not saying that a diversion of resources can't be part of the equation for purposes of developing injury. In fact, you're saying that you have to have the diversion of resources connected to an impact to the core activities. It's the injury plus the causation piece. Well, I think really the core point is that the way that the test has been applied in this court is once you prove a frustration of mission and diversion of resources, you're there, and that's the end of things, and I think that doesn't work anymore, even if diversion of resources may be a relevant part of the calculus. That's all I was saying there. It may be relevant, but it would probably be unnecessary. I mean, in the context of the arguments relating to the felony provision, the plaintiffs here don't have the same type of standing issue that they have with respect to the cancellation one, but you could say if they have standing there and they face the risk of reinforcement, that maybe they're diverting resources in the course of trying to figure out whether the felony provision applies to them and adjust their conduct accordingly, but we don't need the diversion of resources. That's just kind of an additional way of thinking about it, but if they already have standing as to the felony provision, the diversion of resources doesn't add anything. Well, I think that's mostly right in the sense that what I was trying to get at in answering Judge Johnstone's question is that the core inquiry is really not focused on diversion of resources now. It's focused on the interference with activities, and as it relates to the felony provision, I think there are several other problems with plaintiffs standing here beyond any statutory interpretation questions where we think they have a problem, but we think the panel opinion on that front, on standing, really reads out the other Thomas factors that Thomas has said really are important, including whether there's been a real threat of enforcement and whether there's any history of enforcement. The panel opinion, I think, seizes on the first factor, which is whether there's a concrete plan to violate the law, and really stops its analysis there, and we think that's problematic. Counsel, if I understand your argument about the cancellation provision correctly, is that it's really just not regulating private conduct at all. It's really a reflection of what the state's sort of internal process is for processing voter registrations, and that's why the whole rubric of standing that we've developed in the pre-enforcement context is not applicable. Am I understanding your argument correctly? I think that's right. I mean, the direct regulation of the cancellation provision is of government actors. It's not to say that there couldn't be some effect on private actors at some point. I want to be clear about that. It's not like a private citizen could ever be hauled into court under that provision. No, certainly. It's very distinguishable from the felony provision in that way. No, it's not. And then I know there are other questions, but I do want to just talk about the credible threat analysis for the felony provision. Is it my understanding that there is relevant disavowal here, right? So you are speaking for the state when you say that the state does not interpret the felony provision in the way that plaintiffs fear? Well, I want to be clear. I speak for the attorney general. There are county attorneys who have prosecution authority in Arizona. They were not named in this case, though, so I don't— You're speaking for the state attorney general's office in Official Cassidy. Absolutely. And it would be that specifically that mechanism for voting does not include registering voters and that the state is unequivocally or your client is unequivocally disavowing enforcement against individuals who merely engage in voter registration. That's right. And I think importantly, it's not just my boss who has said that, but her predecessor as well. It's two consecutive attorney generals of different parties. It's hard to imagine how you could have more clarity on this from the attorney general. And, Mr. Sam, what's your best case to support your argument that the AG's disavowal of enforcement of the felony provision against voter registration actually supports a finding of no standing? I think the best is Johnson v. Stewart, which is the case about Oregon textbooks. There, the court—I mean, in part to my point earlier, the court looked at the statute and interpreted it, found that it did not apply to the teachers who were the plaintiffs in question there, and included language that said the attorney general of Oregon has repeatedly disavowed any interpretation of the statute that would make it applicable in any way to teachers. And I also think there's a second important point, which is the failure to disavow has been really important in other cases. And if the failure to disavow matters, we think that disavow has to. And can you point to any representation or other guidance from your office, not including the litigation documents that make clear that the felony provision will not be enforced against plaintiff organizations for their voter registration activities? It has been in the context of this case. There's not been separate formal guidance. I think there was a suggestion at one point that there could have been an opinion from the attorney general. That actually only happens in response to a request from a state official, which hasn't occurred here. And this statute was enjoined right at the beginning. So, I mean, it would have been, I think—it wouldn't have made a lot of sense for either the prior attorney general or the current one to be talking about this very much outside the context of this case, which was the immediate focus. Well, Mr. Samuels, the Secretary of State has also asked— the prior Secretary of State has asked us to adopt an interpretation to say that if you don't have standing because this doesn't apply to you, that is also our—at least our tentative reading of that law, right? Right, that it would not apply to the plaintiffs. Yeah. Mr. Samuels, in your view, which elections procedure manual governs the analysis with respect to this plaintiff's standing in this case? Yeah, I think it's tricky at this point because in the district court, the district court was appropriately focused on the 2019 election procedures manual. There has since been another one, as Your Honor likely well knows, that was enacted in 2023. I think in particular because this is a preliminary injunction posture, it's a little tricky to say that the 2023 EPM doesn't matter at all. It's a little hard to kind of put blinders on and ignore it. I'm not sure there's significant relevant differences for the analysis here, though. I agree with you, and I think for purposes of the provision that I'm sort of focused on in the EPMs, both the 2019 and the 2023 manuals have language that deals specifically with the merging and cancellation of registrations. And I wanted to ask you, you know, the county recorders are bound by the provisions in the EPM, and it discusses—the EPM, both versions, regardless of the one we're looking at— talk about the merging and cancellation of duplicate records. And there is a number of things in the record that the defendants have put in that talk about sort of the continual handling of registrations that are made in two counties. And this is not something that has just started to happen since the enactment of this particular piece of legislation. Persons in Arizona have been moving from county to county and registering. And so I just want to clarify that it's your position that that merging and cancellation of duplicate records is the process that is used now just as it was previously. Yes, that's right, Your Honor. And I think that process was largely the result of several other provisions of law. It was kind of the inevitable result even before this statute would have ever been in effect, even though it's been enjoined. And are counties required to maintain records of any cancellations? I believe so. I actually don't know the answer to that for sure, but I do believe so. I believe so, too. And are you aware of any instances where a county recorder has canceled a last-in-time or a new registration of a person as opposed to the first-in-time or an old registration? I don't think there's been any evidence presented of instances like that, and I'm not aware of any separately, Your Honor. Okay. And the EPM includes procedures that counties have to follow before canceling a voter registration based on a change of address, the NCOA process. Do those provisions apply to cancellations under this new statute, 16-165? Well, I think the new statute is largely aimed at the same thing, which is voters who are changing address. And so I think, I'm not sure this is directly responsive to your question, but I think the important point here is really nothing has changed, and the Secretary of State avowed that in the district court below during the stay briefing, which is that with or without this law, the procedures were the same. Thank you. Yeah, I have. With regard to, sorry, the NVRA, does the Attorney General have a position as to whether the language in the NVRA, unless the registrant confirms in writing, means that there has to be direct communication between the registrar and the voter, or what Judge Lee put in his concurrence, reading it a different way, something else, or no position? Yeah, I'll largely defer to Ms. Olson on this, who's planning to talk about the merits. I will say the Attorney General has joined in the merits arguments here, and I think one of those arguments is that there is not direct communication required with the prior county recorder, so long as that county recorder has documentation in front of it that shows that the voter has signed a new registration. Along the lines of the concurrence that Judge Lee wrote? Yes. Okay, thank you. Thank you. Thank you, Your Honor. Good afternoon, Your Honors. May it please the Court. Sean Janda for the United States. I think it might be helpful to start this morning by taking a step back just to articulate the two principles that, taken together, I think resolve the organizational standing question presented by this appeal. Number one, as the Supreme Court has long made clear, no plaintiff, organization, or individual, has a cognizable interest in his moral or ideological views, and so doesn't suffer an Article III injury when a defendant takes actions that impair those policy preferences. And then second, no plaintiff, again, individual or organization, can generate injury where none previously existed by choosing to expend resources in response to a defendant's conduct. And that's the principle that the Supreme Court articulated particularly clearly with respect to organizations in Hippocratic Medicine. And I think if you put those two principles together, that's sort of exactly the theory of standing that the plaintiffs here are advancing. So on the front end, I don't take the plaintiffs to argue, consistent with that first principle, that they themselves would suffer an injury if an Arizona County recorder accidentally canceled a voter's wrong registration at some point in the future. The voter would certainly be injured. That would be contrary to the plaintiff's moral, ideological policy preferences, but it wouldn't directly injure the plaintiffs. And so if that doesn't directly injure the plaintiffs, the plaintiffs cannot then generate a cognizable injury by choosing to expend or divert resources to ameliorate the possibility that that will happen in the future. But diversion of resources can still be relevant to the question of whether this impacts their core business, can it, or do you disagree with that? So I think Judge Bress may have hit the nail on the head earlier, which is that if you have an injury, a direct injury from the defendant's conduct, the fact that you are expending or diverting resources may well be evidence of the effect that the defendant's conduct has on you, and it may well help illustrate that injury. But you cannot, if there is no injury in the first place, you cannot spend your way to standing by expending resources to generate an injury. And so I think what the plaintiffs are really lacking in this case is identifying that sort of first injury or the baseline injury that they are then saying they will expend resources or divert resources in response to. And without that, then I think the whole sort of standing claim just falls apart. Well, there was essentially an argument that, or a concession that the, or it's undisputed that a core activity of plaintiff organizations is voter registration. So let's, if, you know, the law, I think the theory of injury here is that the law effectively requires them to change how they provide that core service. That, to me, is categorically different from the mere policy advocacy discussed in Hippocratic Oath, or truly voluntary diversion of resources, because if they just kept on registering voters in the same way that they always have, they would not be doing it accurately. At least that's the theory of injury being promoted. So I don't think that's the theory of injury, Your Honor. I think the theory is that if they continue doing what they were doing before, it would be less effective in some sense, because some number of the people who they register may end up having the registrations canceled down the line. But I think sort of going back to the first principle, if that happens, and, you know, I think the court can assume for purposes of this argument that the challenge law may lead that to happen in some number of circumstances. It's hard to see how the plaintiffs themselves are injured by that cancellation down the line, by the cancellation of a voter's registration, a voter who is not the plaintiffs. That voter is certainly injured by that. The plaintiff, as a third party, is not injured by that. Well, how is that different from Havens Realty, where, I mean, technically the, you know, the organization that was just providing, like, housing referral information, they weren't directly injured by, you know, someone who came to use their services not getting the apartment they wanted. Really it was just a, you know, the service that they were providing was being impaired by the allegedly unlawful conduct. So I don't think that's correct. And as an initial matter, the Supreme Court in Hippocratic Medicine described Havens as an unusual case that shouldn't be extended beyond its context. And I think a key part of the context in Havens is that the organization there asserted that they had their own legal right to truthful information from the defendant. The Fair Housing Act gave them the legal right to receive truthful information, and the defendant impaired that legal right by providing their employees untruthful information. And so the sort of place that the organization in Havens started was with that direct interference from the defendant. How do you square your argument that you're making right now with the Fourth Circuit's decision in the RNC case from just several months ago? I'm not sure I'm prepared to speak specifically about the RNC case, Your Honor. We haven't taken a position on that. Well, I mean, I think the problem with your argument is that if the – so in the RNC case, you have the same situation where you have an organization that is registering voters or has an interest in particular members of their party being able to have a valid registration to vote, and they allege and ultimately are found to have standing by the Fourth Circuit based on the fact that they're worried that their core activities, which is registering voters, will be impacted negatively by the conduct of the government in potentially canceling registrations. So I don't want to speak specifically to that case without having the opportunity to read it and sort of understand exactly what the Fourth Circuit's reasoning is. But I think that the core principle, again, is that nothing about what the organizations are actually doing is regulated by the cancellation provision. And a helpful counterpoint here is the felony provision, which at least in – But you're basically arguing for is no organizational standing then. You're saying that only individuals who have direct injury to themselves are able to establish standing to bring a claim challenging the cancellation provision. So I think the Supreme Court made very clear in the Hippocratic Madison that only a plaintiff who experiences a direct injury to themselves may bring a suit, setting aside sort of the limited associational standing theory where an association might step into the shoes of a member who himself or herself has standing. And I think an organization can be directly affected, and the felony provision is a very helpful counterpoint here. But the Supreme Court has drawn a distinction between direct injury and being directly the object of regulation. So you can be not the direct object of regulation but be – suffer an injury. So that's true. There are some limited circumstances. And I think the Supreme Court has been very clear that it's substantially harder to establish standing when you are not the object of the defendant's conduct. But – and here, I mean, again, it's not just that the plaintiffs aren't directly regulated. It's that the plaintiffs don't have an independent, legally cognizable interest in whether any particular voter, even one who they sort of help sign up to vote, whether that voter maintains his voter registration. And I think a helpful – again, a helpful analogy here might be the Supreme Court's Kowalski case, which we discussed in our brief. And there, I think the Supreme Court makes it very, very clear that lawyers don't have an independent litigable interest in the laws that affect their clients. And so, you know, the Supreme Court says in that case, you know, an organization of medical – or, sorry, a medical malpractice attorney could not sue to challenge a tort reform statute because the tort reform statute doesn't directly injure the attorney, even if the attorney, you know, might choose to expend resources to develop new arguments or change the way – I ask you the same question I ask counsel for the attorney general. In the NVRA, does the United States have a position as to whether the language, the registrant has changed residence, unless the registrant confirms in writing that the registrant has changed residence, means in every case that there has to be a direct communication with the registrant, or as per Judge Lee's concurrence, that that confirms can be satisfied in other ways? We have not taken a position in this case on any of the merits questions, including how the NVRA applies to the challenge law. We are sort of focused in this case only on the organizational standing question. Mr. Janna, then on that point, and I don't know whether you're prepared to speak on any of the other cases, but if we look at the other courts of appeals that have addressed standing issues in the wake of Hippocratic medicine, some of them find standing, some of them don't find standing, but none of them frame the issue as whether the crux of the inquiry is whether it is in response to – that that's disqualifying, that it's a diversion of resources in response to. They all frame it, I think, as you suggested, about whether, as Hippocratic medicine says, whether it interferes with the core business activities. So whether it was in response to is kind of a sidelight here. I mean, can you show with respect to – because the panel opinion emphasized the point in response to. It had to be – if it was in response to, then that was kind of a danger sign. Can you identify any other court of appeals that's taken that approach as opposed to asking the question that the Supreme Court did, does it interfere with their core business activities? So that's not – I wouldn't say exactly how I read the panel opinion. I think the panel opinion, and certainly we think the Supreme Court's opinion, again, is focused on whether there is a direct injury from the defendant's conduct, and the plaintiffs can't sort of generate an injury by expending resources in response to. But if you had in the first place. What would be – could you give an example of that sort of injury? I know that Hippocratic medicine referred to a retailer injured by a manufacturer's defective product as an example. What would be an example that you would agree would be a direct injury? So I think that's a helpful analogy that the Supreme Court used in thinking about Havens Realty, which certainly the organization there experienced a direct injury because it was provided defective information directly by the defendant, and that's a direct injury to the organization. I think the cancellation – or sorry, the felony provision in this case is another sort of helpful example. If you take the plaintiff's view of how that provision works, the provision in their view sort of directly regulates the activities that they're engaging in by exposing them to potential criminal enforcement based on the way that they are registering voters. And so that's directly affecting or regulating the activities that they're engaged in. It's not affecting or regulating third parties like the voter registrants themselves. It just then sort of has the follow-back effect on the organization. But in Havens, were not the employees testers? I mean, in other words, the employment relationship didn't turn on as much as the fact that they were affiliated or that the organization worked on behalf of the people who got the misinformation and those similarly situated. I don't think so, Your Honor. I mean, the organization there had both sort of clients and employees, and obviously an organization sort of acts through people like its employees. And so there – I mean, I think in the way the Supreme Court conceptualized this in Hippocratic Medicine is that the employee sort of standing in for the organization was directly given untruthful information, like a retailer who has provided a defective good by a manufacturer. And so that sort of direct injury on the employee sort of in his employment and therefore the organization, I think it's the baseline thing that generated the standing in Havens. So in your view, if it had been Havens' say black clients that had been provided the information and not their employees, you think they wouldn't have had standing? I think in that circumstance, you know, certainly setting aside questions about sort of tester standing, the people who received the untruthful information might well have standing. The organization that sort of has a moral, ideological policy interest in helping those people wouldn't have standing independent of their ability to sort of stand in the shoes of those clients. And so here, again, I think there's a really key legal distinction between the voters who the plaintiffs might help and the plaintiffs themselves. And the voters absolutely have a legal interest in not having their voter registrations canceled. And if their registrations are canceled, I'm sure they would have standing to bring suit. But the plaintiffs as kind of third parties, like the lawyers in Kowalski helping their clients, don't have an independent interest in what happens sort of down the line with the voters. All right. Thank you. Thank you. Chief, panel, may it please the court. Tracy Olson and Brett Johnson on behalf of Yuma County Republican Committee. I'd like to try to reserve two minutes for rebuttal. To the extent this court finds standing, it must reach the merits of the felony and the cancellation provisions. Plaintiffs ask this court to read the challenged laws in isolation, but central to the interpretation of both are their statutory context. The relevant statutory context here is the entirety of Title 16, which sets out a comprehensive framework for the administration of elections, including subjects such as voting and voter registration. Title 16 is supported by Election Procedures Manual, which is a document published every two years by the Secretary of State and does carry the force of law. The cancellation felony provisions are just two pieces of this overall election framework in Arizona. And when they're read in their statutory context, any ambiguity or confusion simply does not exist. As observed by the entire panel, the felony provisions phrase mechanisms for voting when read in the statutory context is not unconstitutionally vague. Mechanisms for voting refers to casting a ballot, and this reading is confirmed by the example in the felony provision, ARS 16-1016 text and title, both of which refer to illegal voting, not illegal registration. In fact, the legal voter registration activities that plaintiffs claim fall into the scope of the felony provision are criminalized by a completely different statute. At bottom, registering to vote and voting involve different processes with different consequences. As to the cancellation provision, its statutory context also supports a finding that there's no conflict with the NBRA. Can I just ask a question? As for the cancellation provision up here, plaintiffs argue that it is unclear, based on the statute, whether the county recorders would counsel the older or newer voter registration. Can you help clarify your understanding of how the provision would work in practice? Yes, Your Honor. And I think if we take a step back and look at the framework that the statutory context gives us, it starts with kind of a four-step process. The first is the county recorder receives the registration. That's established by ARS 16-164, and the county recorder then is supposed to update that process. That statute specifies between new and old registrations. Then later in that statute, it talks about notating the cancellation. But 16-164 doesn't actually authorize the cancellation. It just instructs the recorder to notate it. I don't think that the statute uses the words old or new. I don't think any of the statutes that you're referencing or the provisions in the EPM say old or new. Instead, they talk about the uploading of registrations and then the sort of merging and cancellation of duplicate records. ARS 16-166 does discuss the receipt of the new registration form and updating the- I'm sorry. I thought I heard you say 164. And 164 also talks about the new registration form as well. It talks about the receipt of a new registration form. So they both talk about when you receive a new registration form, and you're correct. I see what you're saying. So you're talking about when you have just a single registration form. You're not talking about the reconciliation of duplicate records. Well, I think ARS 16-164 speaks to the reconciliation of duplicate records. And I think your comments earlier today are instructive, and the EPM walks us through this. In our view, the EPM is codifying what these statutory steps say. The one difference between the EPM and what was happening here with the statutes is that there was an express cancellation provision of what was happening in 16-164. So it does reference the new registration form there, and it talks about modifying that record of registration to reflect the changes of addresses. And then it goes on to say that then they're supposed to notate the cancellation of the old registration. And so in our view, 16-165 supplements 16-164 in order to authorize what's already happening. And in response to Chief Judge Merguia's question, this is the process that has been happening with the county recorders for time in memoriam, correct? That's what the record supports, yes. Another question that was asked earlier was about whether or not there's direct communication with the voter and the county recorder. And that's not necessarily what the NVRA requires. I think it's instructive that the NVRA uses the word, state shall not remove the name of the registrant. And if you look to Section 20509 of the NVRA, it talks about how the states are supposed to manage their responsibilities under the law. And it delegates that task to the chief election officer in the state. And in Arizona, that's the Secretary of State. So the Secretary of State manages that through our statewide voter database, which is established by ARS 16-168J. And the county recorders manage that statewide voter database. And so when county recorders receive something, it's done on behalf of the state for purposes of the NVRA. And I think that's completely consistent with the text of the statute. So I heard you say, do we have to decide the felony part of this? You said we had to. If you find standing on the felony provision, you would need to reach the merits. Well, I sort of thought this was before us on the organizational standing. But we have to decide that part of the case as well? Well, Your Honor, the panel decision was vacated completely. So that issue has been vacated. There's no guidance on that issue at this point. So we think the panel concurrence has a good interpretation of the felony provision and would invite this panel to adopt that analysis as to the interpretation of what it— The felony provision, that was dealt with in the panel majority. Correct. But it's vacated. So we would have to—if we conclude there's standing on that, we would reach it? Yes, Your Honor. One of the other questions that was asked was related to— and I just want to return back to the cancellation provision and understanding what's happening here. I think even if this panel disagrees that the county recorders can collectively manage the state's responsibilities under the NVRA, I think this is still consistent with the Seventh Circuit cases. If you look to the end of League of Women Voters v. Sullivan, it talks about how there's no problem under the NVRA when officials are passing along a voter's registration or a sign-sworn statement. And that's exactly what would be happening here, is that the sign-sworn statement that comes from the voter is being passed along between county recorders. But before we get to D1, which is where the panel concurrence suggests that the NVRA has no conflict, it's our position that Arizona's system complies with A3A of the NVRA. And the reason for this is because in Arizona, voter registration is what we call a pick-one paradigmer. And what I mean by this is that you can only be registered to vote where you reside, and you can only reside in one place for the purposes of voting. And thus, a person can only be registered to vote in one place. And because you have to pick one, the submission of a sworn registration form, which is supported by proof of residence, by registering in that new county, it's a request to cancel that old registration. And that's supported by the House and Senate reports that we submitted with our briefing. As to the felony provision, one other point I wanted to speak on before I sit down was that— Actually, I'm going to reserve the rest of my time for rebuttal. Thank you. Thank you. Yes, just one moment. Okay, thank you. Please go ahead and proceed. Thank you. Good afternoon, Chief Judge Murguia, members of the panel, and may it please the Court. My name is Aria Branch on behalf of the plaintiff at Peliz. This case presents an important threshold question. Do voter registration organizations like the plaintiffs here have standing to challenge a law that undermines their work by increasing the likelihood that voter registrations will be canceled, and that will, in turn, make it harder for them to successfully register voters? So in order for you to, I think, succeed on your argument that you're making here, and I'm just going to focus on the language that you just used, you have to be able to show that there is going to be conduct on the part of the defendants that makes your work, the plaintiff's core activities of registering voters, impaired or negatively impacted. So you would agree that you have to establish at a baseline that the cancellation provision is likely to result in county recorders canceling the last-in-time registration of voters that you've registered, correct? We would agree that the operation of the cancellation provision needs to result in the cancellation of the voter registration of an individual, of the voter registration that an individual intends to use, which is likely going to be their last-in-time voter registration. So assuming that's true, and I think that's right, help me understand what best evidence that you have in the record to establish that that is something that is likely to occur, and if it is just the plain language of the statute that doesn't use the words first or last or new or old or first-in-time and last-in-time, if that's really all that you're relying on, which is sort of what I understand your argument to be because the language may not be as clear as you want it to be, what do we do with the mountains of evidence in the record that has been put in by the defendants that that's never been done that way, that there are provisions in the EPM that articulate a process for county recorders to merge and cancel duplicate records which have been happening for a long time in Arizona, and that there are declarations and statements from the Attorney General, the Secretary of State, and the county recorders to that effect? So in our view, the cancellation provision requires the cancellation of registrations based on just the normal operation of state law, and this was what the dissent pointed out. And I think it is extraordinarily important for this court to bear in mind that there are two discrete prongs of the cancellation provision. The first is the one that the defendants have focused on throughout this case, and that is the one that requires an Arizona county recorder to cancel a registration when they receive confirmation that a voter has registered to vote in another Arizona county. The second discrete prong of the cancellation provision requires a county recorder to cancel a registration when they receive credible information that a person has registered to vote in a different county. But there's a second part to that. It isn't just that they shall cancel the registration when they get that credible information. They then have to undergo the process that they would in the first instance, which is to confer with or receive confirmation or do an investigation that involves looking at the database and communicating with the county recorder from the other county. Well, I think the important thing to focus on with respect to that second provision is the fact that it can, and the Secretary of State has interpreted it this way, that it also applies to out-of-state registrations. So, for example, if someone is registered to vote in California and they move from California to Arizona, they register to vote in Arizona, an Arizona county recorder may receive quote-unquote credible information, which is not defined in the statute, that that person remains registered to vote in California because they didn't affirmatively cancel that registration. The cancellation provision only requires the county recorder to reach out to confirm that the person remains registered to vote in California, and according to the cancellation provision, they are then required to cancel that person's Arizona registration. That is the interpretation of the cancellation provision that the Secretary of State agreed with below, which is why we think it is an arguable interpretation, and because of it, because third parties can provide information to Arizona county recorders that individuals are registered in other states, that can force registrations, which our plaintiff organizations have to respond to because they are in the business of voter registration. That is essentially, the cancellation provision requires undoing their work. They have to respond to that. It actually undoes their work. As a result, they have had to change their practice. I just want to walk you through and read with you and have you respond to the Supreme Court's recent decision. They talk about Haven's Realty, and then they compare it to that case, and they say, this is the quote at 1564, but the associations have not claimed an informational injury, and in any event, the associations have not suggested that federal law requires FDA not apply is because the plaintiffs have not alleged an informational injury, and if you agree that you haven't alleged that injury, then I don't understand. Now, maybe you can win under some other case, but it strikes me that what the Supreme Court just said is Haven's is limited to informational injuries. Maybe you can satisfy the standard in some other way, but Haven's isn't going to provide you the avenue to do that. I don't think that Haven's is limited to informational injury. I think Haven's set forth a standard three-part test for organizational standing. I think organizations are held to the same standing requirements as individuals, and there's nothing in Haven's or Hippocratic Medicine that require an organization to suffer an impediment to a legal right. In any event here, we have brought NBRA claims, and under the NBRA, any aggrieved party can bring a claim, and so we do argue that our legal right of ours has been impaired under the NBRA. What's your best authority for the NBRA standing? Under the NBRA, we have statutory standing because any aggrieved party can bring... But that doesn't get us around the Article 3 inquiry. So is there a case where courts have held that an NBRA statutory standing, what's the intersection there that would meet the Haven's test? I'm not sure that it is just an informational injury. Three sentences above, it says that it's still about interference with core business activities, but still, wouldn't you still need to meet that even if you're asserting just a statutory standing? Sure, you still have to meet Article 3 standing. My point is just that, to be clear, I don't think that organizational standing is limited to impairment of a legal right. I don't read Haven's that way, and I don't read the Supreme Court's decision in Hippocratic Medicine to limit Haven's that way. I think the limitation is what Your Honor just articulated, which is plaintiffs have to show an injury or an impairment to their core business activities.
judges: MURGUIA, CALLAHAN, IKUTA, BENNETT, NELSON, BRESS, VANDYKE, SUNG, THOMAS, DESAI, JOHNSTONE